United States Court of Appeals
FOR THE EIGHTH CIRCUIT

———————

No. 96-3953

———————

International Gaming Network,          *
                                      *
          Appellant,                  *   Appeal from the United States
                                      *   District Court for the District
          v.                          *   of South Dakota.
                                      *
Casino Magic Corp.,                   *
                                      *
          Appellee.                   *

———————

Submitted:  May 22, 1997

Filed:  July 17, 1997

———————

Before  RICHARD S. ARNOLD, Chief Judge, and BOWMAN and MORRIS
     SHEPPARD ARNOLD, Circuit Judges.

———————

MORRIS SHEPPARD ARNOLD, Circuit Judge.

International Gaming Network, Inc. ("IGN"), appeals a summary judgment entered in favor of Casino Magic Corporation ("CMC") in an action for tortious interference with a business relationship that existed between IGN and the Sisseton-Wahpeton Sioux Tribe (the "Tribe"). The case, here under our diversity jurisdiction, is governed by South Dakota law. We find that the evidence in the record

is insufficient to support a finding for IGN on its claim, and therefore affirm the judgment of the district court.[1]

## I.

The business relationship at issue here had begun by June, 1993, when the Tribe's governing body, the Tribal Council, effected an agreement with IGN for the latter to build and manage a casino on tribal land. This agreement was not binding on the parties, because federal law required that it be approved by the National Indian Gaming Commission ("NIGC"). See 25 U.S.C. §§ 2701-2721 (Indian Gaming Regulatory Act). The parties agreed at oral argument as well that the agreement did not carry with it an implied undertaking on the part of the Tribe not to repudiate it before the NIGC acted to approve or disapprove it. IGN developed a plan and submitted a proposal to the NIGC to build and operate a casino for the Tribe.

Before the NIGC had acted, the Tribe decided to recall the proposal from the NIGC and to rescind the agreement with IGN. Prior to this action, the Tribe's regular attorney, Bertram Hirsch (who had not been a part of the original negotiations with IGN), was asked by the Tribal Council to review the agreement, a review that ultimately led him to conclude that it was not in the best interests of the Tribe. Expressions of concern over the agreement had been raised at tribal meetings held at the district level (the Tribe comprised seven districts), concerns that contributed to the calling of a public forum that was held on the date that the Tribal Council acted to rescind the agreement. There was, as well, dissension in the ranks of the Tribal Council over the agreement.

There had been, prior to the repudiation of this agreement, only one contact between CMC and the Tribe that IGN thinks is relevant. There is a dispute as to the

---

[1]The Honorable John B. Jones, United States District Judge for the District of South Dakota.

characterization of this contact, but the parties agree that, only a few days before the Council met to rescind the agreement, three agents of CMC entered a Tribe casino in Watertown, South Dakota, and that a meeting lasting no more than fifteen minutes occurred between them and certain members of the Tribe's Gaming Commission and the Tribe's Gaming Board.

CMC contends that the meeting was merely an impromptu and unplanned encounter that arose in the course of a training expedition during which its employees were visiting various casinos. CMC argues, moreover, and IGN does not deny it, that the Gaming Board and the Gaming Commission were bodies whose function was to oversee the Watertown casino only, and that no one present at the meeting had any authority with regard to new casino development.

IGN, on the other hand, maintains that the meeting was a formal presentation by CMC designed to steal away the new casino project. It asserts that CMC distributed company brochures touting its management prowess, and it also points to deposition testimony suggesting that the CMC agents admitted to being there to discuss a management contract. There is also some evidence in the record that Alan Johnson, the Gaming Commissioner for the Tribe's South Dakota gaming operations, was a key participant in, if not the originator of, the meeting.

After the action by the Tribe repudiating its agreement with IGN, IGN acted to try to preserve its relationship with the Tribe. Beverly and Theron Thompson, who had acted as intermediaries between the Tribe and IGN and who had a stake in IGN's agreement, faxed a letter to CMC asking that it disavow any interest in the agreement. The letter stated that "[w]e realize your people were contacted by Alan Johnson.... He will not be Commissioner in North Dakota. He is the precipitator of the whole situation." CMC declined to send back a suggested letter that the Thompsons had attached to their fax, but it did write the Tribe asserting that it had "no interest in

pursuing any of the services mentioned in the fax sample letter and does not intend to do so."

Soon thereafter, Lorraine Rousseau, the chairwoman of the Tribal Council, who had been a key supporter of the IGN agreement, was removed from her leadership position. The Tribal Council, under its new leadership, sought to solicit proposals for the casino, while, at the same time, continuing negotiations with IGN. At this time, the Tribe's attorney, Mr. Hirsch, wrote the Tribe urging it to discontinue negotiations with IGN while it was soliciting proposals from others. The Tribe acceded to Mr. Hirsch's suggestions, and wrote to tell IGN that it was discontinuing negotiations with it in order to "explore other casino management opportunities."

The Tribe then solicited proposals from CMC, as well as from Red Rock, Harrah's, the Mashantucket Pequot Tribe, and several others. The Tribe also informed IGN that IGN could offer a new proposal if it wished, but it did not. Four proposals were received. The Tribe selected Harrah's and CMC as finalists and ultimately entered into an agreement with CMC.

## II.

In order to survive summary judgment, IGN must have evidence that a business relationship existed between it and the Tribe, and that there was an intentional and unjustified act to interfere with that relationship by CMC. There must, as well, have been harm to IGN that can reasonably be attributed to CMC's actions. See Nelson v. Web Water Dev. Ass'n, Inc., 507 N.W.2d 691 (S.D. 1993); see also Restatement (Second) of Torts §§ 766-774A at 7-57 (1979).

While we think it likely that a business relationship of the sort necessary for the commission of this tort ceased to exist between IGN and the Tribe when the Tribal Council rescinded the agreement, it is quite obvious that the necessary relationship was at an end at the time when the Tribe, acting on Mr. Hirsch's advice, notified IGN that

it was discontinuing negotiations and that the contract was going to be rebid. The only relevant evidence offered by IGN of CMC's interest in the casino contract before that time was the meeting at Watertown that we have already adverted to. The difficulty for IGN with this solitary bit of evidence is that on the present record, even when viewed in a light most favorable to IGN, IGN cannot carry its burden of showing that CMC's actions caused the rescission of the agreement.

IGN's main supporter within the Tribe was Lorraine Rousseau, who, as chairwoman, orchestrated the negotiations that gave rise to the original agreement. But her actions with regard to the IGN contract appeared to many in the Tribe to have been hasty, and a general dissatisfaction with her performance led to her losing political power. One act of hers that was criticized was that she had shut Mr. Hirsch, the long-term tribal attorney, out of the IGN negotiations. She testified later that she did not trust him. After the change of Tribal Council leadership, Mr. Hirsch was brought in to review the agreement, and, as we have already indicated, he ultimately concluded that it was not in the best interests of the Tribe. This led directly to a reopening of the casino business to bids.

IGN argues on appeal that the question of attorneys was a red herring since the NIGC had the duty to ensure that a contract between a tribe and casino operators is fair to an Indian tribe: Therefore, IGN argues, not having Mr. Hirsch involved could not have hurt the Tribe. IGN, it seems to us, misses the point that Mr. Hirsch's exclusion from the relevant process, while not necessarily harmful to the Tribe given the NIGC's oversight, was nevertheless a clearly unpopular act, and bolstered the sentiment shared by many tribal members that Ms. Rousseau was acting too brashly with respect to the casino business. Her political downfall was intimately linked to IGN's loss.

In the face of this evidence of political maneuvering, IGN offers only meager evidence that CMC's actions at the Tribe's casino at Watertown were what influenced the Tribe to undo its relationship with IGN. But this contact, which at most involved

the distribution of brochures, occurred with tribal members who had no authority over new casino business. Before IGN could prevail, a jury would have to speculate on the basis of this record that the Watertown meeting caused IGN to lose the business of the Tribe. That, of course, a jury may not do.

## III.

We find that the record before us cannot support a reasonable inference that but for CMC's brief encounter with tribal members at Watertown, IGN's advantageous relation with the Tribe would have been continued. We therefore affirm the district court's grant of summary judgment in favor of IGN.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-6-